UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

@WIRELESS ENTERPRISES, INC.,

                                 Plaintiff

-vs-

AI CONSULTING, LLC and ANDREW IORIO,

                                 Defendants

_____

DECISION AND ORDER

05-CV-6176 CJS(P)

_____

AI CONSULTING, LLC and ANDREW IORIO,

                   Defendants-Third-Party Plaintiffs

-vs-

CRAIG J. JERABECK,  and 5LINX,

                   Third-Party Defendants

_____

APPEARANCES

For defendants and
third-party plaintiffs:

          Eddi Z. Zyko, Esq.
          120 Fenn Road
          Middlebury, Connecticut 06762-2515

          Jules L. Smith, Esq.
          Blitman & King
          The Powers Building, Suite 207
          16 West Main Street
          Rochester, New York 14614

For plaintiff and third-party
defendant Craig J. Jerabeck:

          Paul R. Braunsdorf, Esq.
          Harris Beach LLP
          99 Garnsey Road
          Pittsford, New York 14534

For third-party defendant
5LINX:

          Ellen J. Coyne, Esq.
          31 East Main Street, Suite 2000
          Rochester, New York 14614

1

INTRODUCTION

This is a diversity action for breach of contract and related state-law torts, arising from a franchise agreement between @Wireless Enterprises, Inc. ("@Wireless") and AI Consulting LLC ("AI")[1], involving the operation of a retail cellular telephone services shop.  Now before the Court are the following motions: 1) a motion (Docket No. [#50]) by @Wireless for summary judgment on all counterclaims against it; 2) a motion [#54] by Craig J. Jerabeck ("Jerabeck") for summary judgment as to all claims against him; 3) a motion [#64] by Jerabeck for Rule 11 sanctions; 4) a motion [#69] by 5Linx ("5Linx") for summary judgment on the one claim against it; and 5) a cross-motion [#76] by AI to strike Jerabeck's.  For the reasons that follow, the motions by @Wireless, Jerabeck, and 5Linx are granted, the cross-motion by AI is denied, and all counterclaims and third-party claims are dismissed.

BACKGROUND

Unless otherwise stated, the following are the undisputed facts of this case, viewed in the light most-favorable to Plaintiffs.  At all relevant times, Cellco Partnership doing business as Verizon Wireless ("Verizon"), was a wireless communications service provider, which sold cellular radio service and equipment through its own retail stores, as well as through agents.  @Wireless was a seller of cellular communications services.  In August 2000, Verizon and @Wireless entered into an "Authorized Agency Agreement" ("the Verizon Agreement") (Docket [#16-5]), in which Verizon appointed @Wireless as a "non-exclusive sales agent" for Verizon's cellular radio service.  The

_____

[1]The Court uses the term "AI" herein to refer to both AI and Andrew Iorio.

agreement was for a term of three years.  However, the agreement further provided that Verizon could terminate the agreement, "*without cause*, upon six (6) months written notice to" @Wireless. *Id*. at ¶ 9.1 (emphasis added).  Additionally, the agreement stated that Verizon could "immediately terminate" the agreement upon written notice to @Wireless, if @Wireless breached the agreement. *Id*. § 9.1.1.  Significantly, in that regard, the agreement indicated that: 1) @Wireless could only sell Verizon's products within specified geographic areas; 2) @Wireless could not sell the products of Verizon's competitors; and 3) @Wireless could not sell Verizon's products over the internet.  *See*, Fitzsimmons Affidavit [#59-9]  ¶ ¶ 4, 6-7.

The Verizon Agreement provided that @Wireless could delegate its obligations under the contract to "a subcontractor or sub-agent," by written contract, subject to the express written approval of Verizon.  The agreement further stated: "Personnel employed by, or acting under the authority of, Agent shall not be or be deemed to be employees or agents of Verizon Wireless, and Agent assumes full responsibility for their acts and shall have sole responsibility for their supervision and control." Agency Agreement § 2.  The Verizon Agreement included an addendum, entitled "Addendum Permitting Agent [@Wireless] to Distribute  Cellular Radio Service Through Sub-Agents." Pl. Memo of Law (05-CV-6176, Docket No. [#72-5], Ex. C).  Such addendum ("the Sub-agency Addendum") indicated that @Wireless could contract with sub-agents to sell Verizon's services, subject to Verizon's approval.  Verizon was designated as "the beneficiary" of the addendum. *Id*. at ¶ 3(f). The addendum indicated that the Verizon Agreement would be attached to, and  incorporated by reference into, any

agreement between @Wireless and its sub-agents.  However, the addendum further

stated that @Wireless could "delete from [the copy of the Verizon Agreement provided

to the subagent] all references to commissions, quotas, and related confidential

information." *Id*. at ¶  5.  Finally, the addendum stated: "Except to the extent set forth

herein, Verizon Wireless shall not be considered a party to any contract or [illegible]

between Agent [@Wireless] and sub-agent and shall assume no obligations or liabilities

under any such contracts." *Id*.

Subsequently, in March 2002,@Wireless entered into a franchise agreement

[#1-3] with AI ("the Franchise Agreement"), in exchange for a $145,000 franchise fee

payment from AI to @Wireless.  Specifically, pursuant to the Franchise Agreement, AI

obtained the right to sell "cellular telephones, pagers and accessories and . . . cellular

telephone services, pager services and other related goods and services." Franchise

Agreement ¶ 1.1.  AI agreed that it would sell @Wireless's "authorized products" and

services. *See, e.g., id*. at ¶ 8.1.3.  The agreement did not, though, indicate that AI was

specifically obtaining the right to sell Verizon products.[2]  In fact, the  Franchise

Agreement does not mention Verizon or any other particular service provider.  The

agreement also indicated that franchisees were considered independent contractors,

and that no fiduciary relationship existed between the parties. *Id*. at ¶ 16.1.  The

---

[2]@Wireless's franchise circular indicated that franchisees were purchasing the right to operate
@Wireless retail stores, and to sell "cellular telephones, pagers and accessories and . . . cellular
telephone services, pager services and other related goods and services."  The circular further stated:
"Approved suppliers and specifications are determined based on the current needs for operating the
franchised businesses.  We evaluate approved suppliers based on price, service, quality, and other
commercially reasonable benchmarks.  The identity of approved suppliers and these specifications are
updated periodically[.]"  The circular did not indicate that franchisees would be selling the products of any
particular third-party supplier.  Specifically, the circular did not indicate that franchisees would be selling
Verizon's products or services.

Franchise Agreement was signed by Andrew Iorio on behalf of IA, and by Michael

Battaglia, @Wireless's Vice President of Franchise Development.  The Franchise

Agreement did not mention, and was not signed by, Jerabeck, who was President of

@Wireless at all relevant times.

AI subsequently operated a retail outlet as an @Wireless franchisee in

Southington, Connecticut.  On a few occasions during the course of the business

relationship between AI and @Wireless, AI dealt directly with Jerabeck.  According to

AI, Jerabeck told AI that he would "protect the interests of AI." (Third Party Complaint  ¶

14).

Unbeknownst to AI, between 2002 and 2004, @Wireless breached its

agreement with Verizon by, for example, selling products and services of Verizon's

competitors. *See*, Affidavit of Timothy Fitzsimmons [#59-9] ¶ ¶ 10-21.  Defendant 5Linx,

of which Jerabeck  was the President and sole shareholder in addition to being

President of @Wireless, and which was "affiliated" with @Wireless, also made

unauthorized sales of Verizon's products on its website during this period.  Verizon

complained to Jerabeck about the actions of both @Wireless and 5Linx, and Jerabeck

admitted that @Wireless had breached its agreement with Verizon, and indicated that

@Wireless and 5Linx would cease making unauthorized sales. *Id*.  However, both

@Wireless and 5Linx continued to make unauthorized sales of Verizon's products. *Id*.

Jerabeck did not inform AI of the unauthorized sales by @Wireless and 5Linx, or of the

resulting warnings from Verizon.  For example, Jerabeck did not inform AI that, on July

30, 2004, Verizon sent Jerabeck a "cease and desist" letter, which stated, in pertinent

part, that: 1) @Wireless was breaching the agreement with Verizon; 2) that @Wireless

was required to immediately cease and desist from breaching the agreement; and 3) that "[s]hould [@Wireless] continue its current practice, Verizon Wireless will consider its options." AI Memo of Law in Opposition to Summary Judgment, Exhibit I [#72-11], New Jersey Complaint, Exhibit B. Instead, on or about September 10, 2004, Jerabeck sent an email to AI, stating that @Wireless was in the process of negotiating a new contract with Verizon, which would not affect AI's "day to day operations."  It is undisputed that @Wireless was in fact attempting to negotiate such a contract with Verizon.

However, on or about September 16, 2004,  Verizon cut off service to @Wireless and its franchisees, including AI.  Verizon purportedly terminated its agreement with @Wireless because of the aforementioned breaches of the Verizon Agreement by @Wireless, including the sale of competitors' products, and the sale of Verizon's products over the internet. (AI Memo of Law in Opposition to Summary Judgment, Exhibit I [#72-11], New Jersey Complaint, Exhibit C).  Verizon also simultaneously commenced an action against  @Wireless in United States District Court for the District of New Jersey. *Id*.  On or about September 21, 2004, @Wireless counter-sued Verizon in New York State Supreme Court, Monroe County.  @Wireless and Verizon subsequently settled the lawsuits and terminated their agreement.  In connection with the settlement, Verizon reinstated service to @Wireless's franchisees, including AI, through November 24, 2004.  After that date, AI and other franchisees were not able to sell Verizon products or services as subagents for @Wireless.  @Wireless offered franchisees some type of monetary compensation for business that was lost during the period that Verizon service was cut off.  Additionally, @Wireless attempted to negotiate

new agreements with service providers other than Verizon.[3]  However, AI decided to terminate its relationship with @Wireless.  On January 4, 2005, @Wireless stopped doing business.

Subsequently, @Wireless commenced the subject proceeding against AI, seeking monies allegedly owed pursuant to the parties' franchise agreement and accompanying asset purchase agreement.  AI answered the complaint and asserted the following eight counterclaims against @Wireless: 1) constructive fraud; 2) actual fraud; 3) constructive trust; 4) breach of contract; 5) breach of good faith and fair dealing; 6) interference with contractual relationships; 7) violation of New York General Business Law § § 349-350; and 8) negligent misrepresentation.

AI also commenced the subject third-party action against Jerabeck, 5Linx, and Verizon.  In the Third-Party Complaint ("TPC"), AI alleges eight causes of action against Jerabeck, for: 1) constructive fraud; 2) actual fraud; 3) constructive trust; 4) breach of contract; 5) breach of implied covenant of good faith and fair dealing; 6) interference with contractual relationship; 7) violation of New York State General Business Law ("GBL") § § 349-350; and 8) negligent misrepresentation.  As to these claims, AI alleges that, at all relevant times, Jerabeck was the "President, Chief Executive Officer (CEO), owner and alter egos of @Wireless and 5Linx" (TPC ¶ 9), and that he intentionally and/or negligently made various false statements which induced AI to enter into and remain in the franchise agreement with @Wireless, caused @Wireless to breach the agreement with Verizon, and ultimately led to the demise of AI's business.

---

[3]*See*, docket no. [#69-3].

7

AI alleged the same eight causes of action separately against 5Linx, and in that regard, contended that 5Linx, @Wireless, and Jerabeck were alter egos, and that 5Linx ratified and approved Jerabeck's actions.  Finally, AI asserted all but the negligent misrepresentation claim separately against Verizon.

Verizon and 5Linx subsequently filed motions to dismiss the third-party complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Jerabeck did not move against the complaint.  On November 1, 2006, the Court issued a Decision and Order [#33], dismissing all claims against Verizon, and dismissing all claims against 5Linx, except the claim that 5Linx tortiously interfered with the contract between @Wireless and AI.

Consequently, the claims remaining in this action are as follows: 1) @Wireless's first-party claim against AI for breach of contract; 2) AI's counterclaims and  third-party claims against @Wireless and Jerabeck, respectively, for  constructive fraud, actual fraud, constructive trust, breach of contract, breach of implied covenant of good faith and fair dealing, interference with contractual relationship, violation of New York State General Business Law ("GBL") § § 349-350, and negligent misrepresentation; and 3) AI's third-party claim against 5Linx for tortious interference with contract.

Following a period of pretrial discovery, the parties filed the subject motions. @Wireless, 5Linx, and Jerabeck all move for summary judgment. Additionally, Jerabeck moves for Rule 11 sanctions against AI's attorney.  AI opposes the motions, and in addition, cross-moves to strike Jerabeck's affidavit submitted in support of the summary judgment motions, as a sanction for spoliation of evidence.

ANALYSIS

*Rule 56*

Summary  judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322?23 (1986)), cert denied, 517 U.S. 1190 (1996).  Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light

most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, it is well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)(citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) (citations omitted).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

*AI's Motion to Strike Jerabeck's Affidavit*

At the outset, AI contends that the Court should strike Jerabeck's affidavit submitted in support of summary judgment, as a sanction for spoliation of evidence.  In that regard, Jerabeck testified at his deposition that certain corporate records were either lost or thrown away in or about 2007.  Specifically, Jerabeck testified that he "assumed" that certain documents were thrown away or misplaced, because he did not personally have possession of any documents, except certain documents of which copies had already been produced to AI's attorney, and certain documents in the possession of Jerabeck's attorney.  Because of such testimony, AI maintains that Jerabeck could not have personal knowledge about the matters set forth in his affidavit concerning @Wireless's corporate workings:

> [I]t is manifestly impossible for Jerabeck to make the statements that he does in his Affidavit in support of his and @Wireless's motions for summary judgment, particularly in Paragraph 9 thereof, and Paragraph 6 of his Statement of Material Facts Not in Dispute filed in support of his

and @Wireless's motions for summary judgment.  As but one example
thereof is the statement "Minutes were kept of all corporate meetings."

(AI Motion to Strike [#76] at 3).  Although AI refers to paragraph 9 of Jerabeck's

Statement of Facts, it appears that AI is actually referring to paragraph 10 of that

document, which states, in pertinent part:

> The business of @Wireless was run totally separately and independently
> from any personal work or activities of Jerabeck.  This clear distinction
> between the business of @Wireless and the personal activities of
> Jerabeck is reflected by the following. (Jerabeck Aff., ¶ 9).  A. Corporate
> meetings were held on a regular basis during the years that @Wireless
> was actively engaged in business, and at all times relevant to this
> litigation.  B. Minutes were kept of all corporate meetings.  C.
> Shareholders' assets were not used in conducting the business of
> @Wireless.  D. @Wireless maintained corporate records.  E. @Wireless
> maintained substantial assets and inventory for the conducting of its
> business.  F. @Wireless had bank accounts separate from Jerabeck and
> other corporate officers and was sufficiently capitalized such that it was
> able to conduct business from the time of its inception until is ceased
> active operations.  G. All of the business of @Wireless was conducted in
> its corporate name.  H. All payments for corporate obligations were made
> from the corporate checking account of @Wireless.  I. The business in
> which @Wireless was engaged was never conducted by Jerabeck in his
> personal capacity.  J. All assets, of every kind used in the business, were
> titled in the name of @Wireless.  K. @Wireless did not use assets
> belonging to Jerabeck or any other shareholding in its daily operations.  L.
> The corporate books of @Wireless were maintained separately from
> Jerabeck's personal records.  M. The financial records of @Wireless were
> audited every year by the Insero accounting firm in Rochester, New York.
> N. Jerabeck never used the corporate funds of @Wireless for any
> personal purchases he made.

Jerabeck Stmt. of Facts [#55] ¶ 10.

In response to the motion to strike, Jerabeck submitted an affidavit [#83], in

which he states that documents relating to AI's litigation were kept by @Wireless, but

other documents were destroyed. *Id*. at ¶ 4.  Jerabeck further states that documents

pertaining to this litigation were produced to AI during discovery. *Id*.  Additionally,

Jerabeck states that he prepared his earlier affidavit based on his own personal knowledge, and not on documents, as AI supposes.  In that regard, Jerabeck states, in pertinent part: "I was the President and CEO of @Wireless and at one time was the sole owner. . . .  From holding that position, I know that corporate meetings were held on a regular basis.  I was a 'hands on' President and knew in great detail the day-to-day activities of @Wireless and the fact that a clear distinction existed between those activities and my activities as an individual[.]" *Id*.

The law concerning spoliation of evidence is as follows:

We have defined spoliation as the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.  The spoliation of evidence germane to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.  This sanction serves a threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation.  In borderline cases, an inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment.

Where one seeks an adverse inference regarding the content of destroyed evidence, one must first show that the party having control over the evidence  had an obligation to preserve it at the time it was destroyed.  Such an obligation usually arises when a party has notice that the evidence is relevant to litigation but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation.  The law in this circuit is not clear on what state of mind a party must have when destroying it. . . .  [A]t times we have required a party to have intentionally destroyed evidence; at other times we have required action in bad faith; and at still other times we have allowed an adverse inference based on gross negligence. In light of this, we concluded a case by case approach was appropriate.  Finally, a court must determine whether there is any likelihood that the destroyed evidence would have been of the nature alleged by the party affected by its destruction.  The burden falls on the prejudiced party to produce some

> evidence suggesting that a document or documents relevant to
> substantiating his claim would have been included among the destroyed
> files.

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107-108 (2d Cir. 2001)

(citations and internal quotation marks omitted).

In this case, AI has not shown that Jerabeck is guilty of spoliation. For example, AI's motion alleges, in cursory fashion, only that unspecified @Wireless documents were thrown away. AI does not identify any particular documents that were destroyed. Additionally, AI does not maintain that it made a discovery demand for any of the documents that were destroyed. Jerabeck states, and the deposition transcript indicates, that, at his deposition, he provided AI's attorney with a large number of documents, which he had reviewed in preparing for the deposition. AI's attorney then asked Jerabeck generally about other @Wireless records, and Jerabeck stated that he had kept documents relating to AI, but he assumed that other documents were destroyed. From this, AI argues that Jerabeck could not have personal knowledge concerning the operations of @Wireless that are discussed in his affidavit. However, the Court disagrees. Having considered the factors discussed above, AI's cross-motion to strike is denied.

### Claims Against Jerabeck In His Personal Capacity

Jerabeck was the President of @Wireless and the President and sole shareholder of 5Linx. AI asserts claims against Jerabeck personally, on the theory that he is the alter ego of both @Wireless and 5Linx. Accordingly, the Court must consider whether AI may pierce the corporate veils of @Wireless and 5Linx, and maintain claims against Jerabeck. The law concerning the alter-ego doctrine is well settled:

> Corporations, of course, are legal entities distinct from their managers and shareholders and have an independent legal existence. Ordinarily, their separate personalities cannot be disregarded.  In a broad sense, the courts do have the authority to look beyond the corporate form where necessary to prevent fraud or to achieve equity.  More specifically, where a shareholder uses a corporation for the transaction of the shareholder's personal business, as distinct from the corporate business, the courts have held the shareholder liable for acts of the corporation in accordance with the general principles of agency.  The determinative factor is whether 'the corporation is a 'dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends.

*Port Chester Elec. Const. Co. v. Atlas*, 40 N.Y.2d 652, 656, 389 N.Y.S.2d 327, 331

(1976) (citations omitted); *Rivera v. Citgo Petroleum Corp.*, 181 A.D.2d 818, 819, 583

N.Y.S.2d 159 (2nd Dept. 1992) ("Generally, courts will only pierce the corporate veil and

hold two corporations to constitute a single legal unit, where one is so related to, or

organized, or controlled by, the other as to be its instrumentality or alter ego.")

In support of his application for summary judgment on all claims, Jerabeck

maintains that it was clear that AI was dealing with @Wireless at all times, and not with

him personally.  On this point, Jerabeck states, for example, the following facts: 1)

Every page of the franchise agreement between @Wireless and AI contained a box for

the initials of AI's President, Mr. Iorio, and Michael Battaglia, a representative of

@Wireless; 2) the franchise agreement did not refer to Jerabeck; 3) the franchise

agreement contained the statement, "[y]ou acknowledge that, in all of their dealings

with you, our officers, directors, employees and agents act only in a representative, and

not in an individual, capacity;" 4) emails sent to AI were signed by Jerabeck as

"President and CEO of @Wireless."  Jerabeck Rule 56.1 Stmt.  Jerabeck also states in

his affidavit that @Wireless and 5Linx observed corporate formalities.

14

In opposition to Jerabeck's motion, AI states that its President, Mr. Iorio, met with Jerabeck while negotiating the franchise agreement, and believed "that he was dealing with Jerabeck personally, and [that] Jerabeck was the business opportunity with whom he was joining."   AI states that during one such meeting, Jerabeck "did not mention" that he was the President of @Wireless.  AI also indicates that Jerabeck traveled to Connecticut on a few occasions to meet with franchisees.  AI further refers to deposition testimony by Jerabeck, in which he indicates that he personally lost one million dollars as a result of the dispute between @Wireless and Verizon.

Such facts do not create a triable issue of fact as to whether Jerabeck was the alter ego of @Wireless or 5Linx.   In that regard, a plaintiff's subjective belief that he was dealing with a defendant in his personal capacity is insufficient to defeat summary judgment, where the agreement indicates that defendant was acting as a corporate representative, and where there is no evidence that defendant abused the corporate form. *See, Colucci v. AFC Const.*, 54 A.D.3d 798, 798-99, 863 N.Y.S.2d 767, 768-69 (2d Dept. 2008):

> Catanzaro demonstrated that the construction contract at issue was solely between the plaintiffs as property owners and the defendant Southbayview Construction Corporation (hereinafter Southbayview), Catanzaro's closely-held corporation. The text of the contract expressly and unequivocally established that Catanzaro executed the agreement only as the representative of Southbayview, and the plaintiffs failed to present any evidence of an intention that Catanzaro was to be personally bound thereby.  In this regard, the plaintiff Steven Colucci's conclusory assertions in opposition to the motion for summary judgment that he was unaware that any corporation was involved in the transaction and believed that Catanzaro was conducting business as an individual are completely contradicted by the language of the contract. . . .
>
> The plaintiffs similarly failed to raise an issue of fact as to whether Catanzaro abused the corporate form in order to commit a wrong which

injured them, so as to warrant the piercing of Southbayview's corporate veil in order to hold him personally liable.

AI has not raised a triable issue of fact as to Jerabeck's personal liability under the alter ego theory.

As to any the contractual claims against Jerabeck , the Court having rejected AI's alter ego theory, finds that he is entitled to summary judgment. He was not a party to any contract involved in this action in his individual capacity, and therefore, he cannot be liable on the claims for breach of contract or breach of the implied covenant of good faith.  Accordingly, Jerabeck is entitled to summary judgment on AI's fourth and fifth, third-party claims against him.

As to various tort claims against Jerabeck, apart from its alter ego theory,  AI contends that Jerabeck is personally liable even though he committed the acts at issue in his capacity as a corporate officer.   In that regard, in New York, "[a] corporate officer who participates in the commission of a tort, regardless of whether he acts on behalf of the corporation and in the course of his corporate duties, may ordinarily be held individually responsible." *LaLumia v. Schwartz*, 23 A.D.2d 668, 669, 257 N.Y.S.2d 348, 350 (2d Dept. 1965); *see also, Bailey v. Baker's Air Force Gas Corp.*, 50 A.D.2d 129, 133, 376 N.Y.S.2d 212, 216 (3d Dept. 1975) ("Corporate officers are liable for their torts although they committed them when acting officially.").  Therefore, the Court will now consider whether Jerabeck is entitled to summary judgment on the various tort claims, along with whether  @Wireless and 5Links are entitled to summary judgment on any claim or claims against them.

*Actual Fraud and Constructive Fraud Claims Against @Wireless and Jerabeck*

First the Court turns its attention to AI's claims for actual fraud and constructive fraud.   In that regard, AI contends that @Wireless and Jerabeck fraudulently induced AI to enter into the Franchise Agreement with @Wireless, by misleading AI about the problems that @Wireless was having with Verizon, and by telling Iorio that he would protect AI's interests.

To prevail on a cause of action for actual fraud, a plaintiff must establish that a defendant made "a representation of fact, which is either untrue and known to be untrue or recklessly made, and which was offered to deceive the other party and to induce him to act upon it, causing injury." *Klembczyk v. Di Nardo*, 265 A.D.2d 934, 936, 705 N.Y.S.2d 743, 744 (4th Dept. 1999) (citation and internal quotation marks omitted). The elements of constructive fraud are the same as those for actual fraud, except that the element of scienter is replaced by a fiduciary or confidential relationship between the parties. *Id.*, 265 A.D.2d at 936, 705 N.Y.S.2d at 744.  Such a relationship requires a "high degree of dominance and reliance," and where the parties have an arm's length business relationship, a plaintiff's "subjective claims of reliance on defendants' expertise" are insufficient. *SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 355, 777 N.Y.S.2d 62, 65 (1st Dept. 2004) (citations omitted).  Rule 9(b) of the Federal Rules of Civil Procedure requires that averments of fraud be "stated with particularity," which means that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355

F.3d 164, 170 (2d Cir. 2004).

To the extent that AI is alleging that @Wireless and Jerabeck fraudulently induced AI to enter into the Franchise Agreement, @Wireless and Jerabeck are entitled to summary judgment, because the alleged misrepresentations and omissions concerning Verizon did not occur until after the agreement was formed.  However, AI also appears to allege that in 2004, @Wireless and Jerabeck fraudulently concealed the problems that @Wireless was having with Verizon, and that @Wireless and Jerabeck had a fiduciary duty to disclose that information.  In that regard,

> [t]he elements of a fraudulent misrepresentation claim consist of a misrepresentation or a material omission of fact which was known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party and injury.  A claim for fraudulent concealment requires additionally setting forth that the defendant had a duty to disclose material information. Such a duty arises where a fiduciary or confidential relationship exists between the parties.

*Mandarin Trading Ltd. v. Wildenstein*, 65 A.D.3d 448, 884 N.Y.S.2d 47, 57 (1st Dept. 2009) (citations and internal quotation marks omitted).  It appears well settled that generally, "[t]here is no fiduciary relationship between a franchisee and a franchisor." *Akkaya v. Prime Time Transp., Inc.*, 45 A.D.3d 616, 845 N.Y.S.2d 827, 828 (2d Dept. 2007) (citations omitted); *see also, Wilmington Trust Co. v. Burger King Corp.*, 34 A.D.3d 401, 826 N.Y.S.2d 205, 206 (1st Dept. 2006) ("[B]ecause the relationship between the franchisor and franchisees was not a fiduciary one, the franchisor had no affirmative duty to disclose that the consultant was acting on its behalf rather than the franchisees" ).  Here, there is no indication that AI and @Wireless had anything other than an arm's-length franchisor-franchisee business relationship.  Nor is there any evidence that Jerabeck and AI had a fiduciary relationship.  Consequently, the Court

18

finds that @Wireless and Jerabeck are entitled to summary judgment on the fraud and constructive fraud claims.

*Constructive Trust Claim Against @Wireless and Jerabeck*

The Court will now consider AI's constructive trust claim.  It is well settled that four elements are required for a constructive trust: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject *res* made in reliance on that promise; and (4) unjust enrichment." *In re First Central Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004) (citations omitted).  As already discussed, in general there is no fiduciary relationship between a franchisor and franchisee. *See, Marcella & Co., Inc. v. Avon Prods., Inc.*, 282 A.D.2d 718, 719, 724 N.Y.S.2d 192, 193 (2nd Dept. 2001) ("[T]here is no fiduciary relationship between a franchisee and a franchisor.") (citation omitted).  AI has not raised a triable issue of fact on this point.   Consequently, @Wireless and Jerabeck are entitled to summary judgment on the constructive trust claims.

*Claims for Violation of NY General Business Law (GBL) § § 349-350*

AI next contends that @Wireless and Jerabeck violated New York's statutory prohibition against deceptive business practices and advertising.  GBL § 349 prohibits deceptive business practices, while GBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service."  Significantly, claims under GBL § § 349 and 350 must involve conduct that was directed at the public at large. *Canario v. Gunn*, 300 A.D.2d 332, 333, 751 N.Y.S.2d 310, 311 (2d Dept. 2002).  Consequently, claims arising from private disputes are not actionable.

*New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 320, 639 N.Y.S.2d 283, 290

(1995) ("The conduct need not be repetitive or recurring but defendant's acts or

practices must have a broad impact on consumers at large; private contract disputes

unique to the parties  would not fall within the ambit of the statute") (emphasis added,

citation omitted);  *Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 893 N.Y.S.2d 208, 215 (2d

Dept. 2010) ("In connection with the character of General Business Law § 349 as a

broad consumer protection statute and the requirements that the complained of

conduct have a broad impact on consumers at large, the statute does not apply to

private contract disputes unique to the parties.") (citations and internal quotation marks

omitted).   The instant action involves a private contract dispute; therefore @Wireless

and Jerabeck are entitled to summary judgment on the GBL claims.

*Negligent Misrepresentation Claims Against @Wireless and Jerabeck*

The Court will now consider AI's claims against @Wireless and Jerabeck for

negligent misrepresentation.  The elements of such a claim are that

> (1) the defendant had a duty, as a result of a special relationship, to give
> correct information; (2) the defendant made a false representation that he
> or she should have known was incorrect; (3) the information supplied in
> the representation was known by the defendant to be desired by the
> plaintiff for a serious purpose; (4) the plaintiff intended to rely and act
> upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.
> However, the alleged misrepresentation must be factual in nature and not
> promissory or relating to future events that might never come to fruition.

*Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20-21 (2nd Cir. 2000)

(citations omitted).  As to the first of these elements, in order to determine the existence

of a special relationship and duty in the context of a negligent misrepresentation claim,

the Second Circuit has held that New York law requires a fact finder to consider the

following three factors: "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir.2001) (quotation marks and citation omitted).  In *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996), the New York Court of Appeals explained that "[i]n the commercial context, a duty to speak with care exists when the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for information." (quotation marks and citation omitted).  In general, though, a simple commercial relationship, such as that between a buyer and seller or franchisor and franchisee, does not constitute the kind of "special relationship" necessary to support a negligent misrepresentation claim. *See Dimon, Inc. v. Folium, Inc.*, 48 F.Supp.2d 359, 373 (S.D.N.Y.1999) ("[A]n arm's length business relationship is not enough.") (citation omitted); *see also, Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 215 (S.D.N.Y. 2007) ("A simple commercial relationship, such as that between a franchisor and franchisee, does not constitute the kind of special relationship necessary for a negligent misrepresentation claim.") (citations omitted).

In this case, as already discussed, AI has not produced evidentiary proof in admissible form that there was a special relationship of trust between itself and @Wireless and/or Jerabeck. Instead, the record indicates that the parties had an arm's-length business relationship.  Consequently, @Wireless and Jerabeck are

entitled to summary judgment on the negligent misrepresentation claims.

*Tortious Interference Claims Against @Wireless, Jerabeck, and 5Linx*

AI also asserts tortious interference with contract claims against @Wireless, Jerabeck and 5Linx.  "[T]he tort of intentional interference with the performance of a contract requires proof of the following elements: a valid contract between plaintiff and a third party; defendant's knowledge of the contract; defendant's intentional procurement of a breach by the third party; and resultant damages." *Chu v. Dunkin' Donuts Inc.*, 27 F.Supp.2d 171, 173 (E.D.N.Y. 1998) (citations omitted).  A defendant intentionally procures a breach when he "knows of a valid . . . contract" and "commits an intentional act whose probable and foreseeable outcome is that one party will breach the contract, causing the other party damage." *Leventhal v. Franzus Co., Inc.*, No. 88 CIV. 3547 (MBM), 1988 WL 132868 at *7 (S.D.N.Y. Dec. 6, 1988).

Here, AI's pleadings are unclear concerning  the contract that was subject of the tortious interference . In its counterclaim, against @Wireless, AI contends that @Wireless interfered "with the aforesaid business or contractual relationships of AI," referring to "[t]he interlocking contracts and understandings AI . . . on the one hand and @Wireless and Cellco [Verizon] on the other." Answer with Counterclaims [#15] at p. 23, ¶e 29 & p. 24, ¶ 31.  With respect to this assertion, AI contends that the Verizon Agreement, between Verizon and @Wireless, and the Franchise Agreement, between @Wireless and AI, were "interlocking agreements."  AI similarly refers to such "interlocking contracts" in the Third Party Complaint, *see, e.g.*, at ¶ ¶ 21, 26, 36, 41, 43. However, in its papers submitted in opposition to the summary judgment motions, AI

expressly contends that it is a party to the Verizon Agreement, which it identifies as the contract that was breached. *See*, Pl. Stmt. of Facts [#78] at p. 9 ("Therefore, according to its very terms, AI, et al, and FLB, are parties to said Contract No. 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."); *see also, id*. a p. 11, ¶ numbered 3 ("FLB et al., are parties to said Contract No. 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.").

To the extent that AI is relying on the alleged breach of the Verizon Agreement, it cannot prevail on its tortious interference claims, since, as the Court has already held in this action, @Wireless's franchisees, including AI, were neither parties to, nor third-party beneficiaries of, that contract. *See,* Decision and Order [#33] at p. 10.

Consequently, AI may only avoid having summary judgment entered against it on its tortious interference claims if it can produce evidence that Jerabeck and/or 5Linx caused a breach of *the Franchise Agreement*.  However, on this point, it does not seem that AI is even maintaining that such Franchise Agreement was breached.  Instead, as already discussed, AI devotes a great deal of energy, and the vast majority of the space in its papers, to arguing that it is a party to the Verizon Agreement, presumably because it has, in its view, evidence that such agreement was breached, based upon the affidavits and deposition of Verizon employees Timothy Fitzsimmons [#72-8] and Mario Turco [#72-9].  For example, in its Memorandum of Law [#79] submitted in opposition to 5Linx's motion, AI explains that its tortious interference claim is based on the alleged breach of the Verizon Agreement. *See, id*. at 4-8; see also, Pl. Memo of Law [#72] at 17 ("If AI, et al, and FLB, et al, were informed of Jerabeck's egregious conduct that *cause Verizon to terminates [sic] said business relationship with @Wireless and, hence,*

23

*themselves*, [they] could and would have taken timely measures[.]") (emphasis added).

In short, the only contract in this action to which AI was a party was the Franchise

Agreement, and AI has not shown, or even specifically claimed, that such agreement

was breached.  Such fact is highly significant, since the movants specifically argued

that AI could not establish a breach of the Franchise Agreement. *See, e.g.*, 5Linx Memo

of Law [#69] at 10 ("AI Consulting simply does not have a remedy of tortious

interference without a valid claim for a breach of contract."); *see also, id*. at 12  ("The

claim for a material breach [of the Franchise Agreement] by @Wireless must fail based

simply on the facts that @Wireless was able to perform under its agreement with AI

Consulting, had timely cured the termination of services by Verizon by offering new

carriers and the AI Consulting franchise agreement did not expressly state [that]

@Wireless is to provide any specific carrier to it, including Verizon.").  Nor does it

appear that AI could establish such a breach, since, as discussed above, the Franchise

Agreement was not dependent on AI's or @Wireless's ability to sell Verizon products or

services.  Instead, as mentioned earlier, AI was aware that Verizon always had the right

to terminate its agreement with @Wireless without cause.  In such case, the Franchise

Agreement would have continued to exist, notwithstanding the termination of the

Verizon-@Wireless relationship, and AI and the other franchisees would have retained

the right to sell other products and services as authorized by @Wireless.  In any event,

AI has not produced evidentiary proof in admissible form that the terms of the Franchise

Agreement were breached.  Consequently, Jerabeck and 5Linx are entitled to summary

judgment on the tortious interference with contract claims.

AI's tortious interference counterclaim against @Wireless also lacks merit, since

24

one cannot tortiously interfere with a contract to which he is a party. *See, Burnett v. Unisys Corp.*, No. 89-CV-923, 1989 WL 135561 at *3 (N.D.N.Y. Nov. 7, 1989) ("[U]nder New York law one can not tortiously interfere with its own contract.").

*Contractual Counterclaims Against @Wireless*

AI contends that @Wireless breached "interlocking contracts" between AI, @Wireless, and Verizon, including breaching the implied covenant of good faith and fair dealing. However, for the reasons discussed above, Plaintiff has not come forward with evidentiary proof in admissible form sufficient to raise a triable issue of fact as to whether @Wireless breached the Franchise Agreement.[4]

*Jerabeck's Application for Rule 11 Sanctions*

Jerabeck contends that he is entitled to sanctions against AI's attorney, because the alter ego claims against him were "frivolous and utterly unsupported by any facts." Jerabeck Memo of Law [#66] at 2. Jerabeck states that during his deposition, AI's counsel did not ask questions relevant to piercing the corporate veil. Jerabeck further state's that Iorio's own deposition indicated that he had no basis to pierce the corporate veil and assert claims directly against Jerabeck. Consequently, Jerabeck contends that AI's attorney violated Rule 11(b) by pursuing a claim with no evidentiary support. In response, AI's counsel submitted a two-page memo of law, maintaining that Jerabeck's application is deficient, because it does not describe the specific conduct alleged to

---

[4]To establish a claim of breach of contract under New York law, a plaintiff must show "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Holdings, Inc. v. Biderman*, 21 F.3d 522, 525 (2d Cir.1994) (citation omitted). Moreover, "[u]nder New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (citation and internal quotation marks omitted).

have violated Rule 11 or the specific sanction being sought. Memo of Law [#81] at 2.

AI's counsel also contends that the "case" against Jerabeck is meritorious, without

specifically claiming that the alter ego claim is meritorious. *Id*.

The law in this circuit concerning Rule 11 violations is clear:

Fed.R.Civ.P. 11, which confers on a district court authority to sanction a litigant or its counsel, provides in relevant part:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,-
>
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; [and]
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law[.]

Fed.R.Civ.P. 11(b). The 1993 Advisory Committee Note explains that Rule 11(b)(2) "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." Fed.R.Civ.P. 11 advisory committee note to 1993 amendments. In addition, "the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys should certainly be taken into account in determining whether paragraph (2) has been violated." *Id*. "Although arguments for a change of law are not required to be specifically so identified, a contention that is so identified should be viewed with greater tolerance under the rule." *Id*.

Once a court determines that Rule 11(b) has been violated, it may in its discretion impose sanctions limited to what is "sufficient to deter repetition of such conduct." Fed.R.Civ.P. 11(c)(2); see also Fed.R.Civ.P. 11 advisory committee note to 1993 amendments. The court may impose, among other things, monetary sanctions. See Fed.R.Civ.P. 11(c)(2). Monetary sanctions, however, "may not be awarded against a represented party for a violation of subdivision (b)(2)," Fed.R.Civ.P. 11(c)(2)(A),

> because "[m]onetary responsibility for such violations is more properly
> placed solely on the party's attorneys," Fed.R.Civ.P. 11 advisory
> committee note to 1993 amendments.

*Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 166 (2d

Cir. 1999).

Applying the foregoing objective standard, the Court finds that Plaintiffs' claims

against Jerabeck, under the alter ego/veil piercing theory, were not warranted by

existing law or by a nonfrivolous argument for the extension, modification, or reversal of

existing law or the establishment of new law.  In that regard, Plaintiffs have not

produced any evidence to support an alter ego/veil piercing theory.  Having found a

violation of Rule 11(b), the Court must consider, in its discretion, whether to impose a

sanction, with any such sanction being limited to what is sufficient to deter repetition of

such conduct.  Sanctions may include "(a) directives of a nonmonetary nature, such as

striking the offending paper, issuing an admonition, reprimand, or censure, or, requiring

participation in seminars or other educational programs; (b) an order to pay a penalty

into court; or (c) referring the matter to disciplinary authorities." *Boyce-Idlett v. Verizon*

*Corporate Services Corp.*, No. 06 Civ. 975(DAB)(KNF), 2007 WL 3355497 at *2

(S.D.N.Y. Nov. 6, 2007) (citations omitted).  Jerabeck has not requested any particular

sanction.

Having considered the matter, the Court believes that an admonition is sufficient

to deter future conduct.  Consequently, AI's counsel is hereby advised that his conduct

in pursuing a claim without an objectively proper factual or legal basis violated Rule

11(b), and he is admonished and directed to avoid such conduct in the future.

CONCLUSION

AI's motion [#76] to strike is denied.  @Wireless's motion for summary judgment [#50] is granted, and AI's counterclaims are dismissed.  Jerabeck's motions for summary judgment [#54] and for sanctions [#64] are granted.  5Linx's motion for summary judgment [#69] is granted.  The third-party action is dismissed.  This case will proceed to trial on @Wireless's breach of contract claim against AI.

SO ORDERED.

Dated:      Rochester, New York
            May 13, 2011

                                   ENTER:


                                   /s/ Charles J. Siragusa
                                   CHARLES J. SIRAGUSA
                                   United States District Judge